United States District Court
Southern District of Texas
**ENTERED**
November 10, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VIRGILIO DELA CRUZ, | § § § | |
| *Plaintiff*, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:19-CV-04590 |
| ST. JOHN'S SCHOOL, | § § § | |
| *Defendant*. | § § | |

### ORDER

Before the Court are Defendant St. John's School's Motion for Summary Judgment (Doc. No. 18), Plaintiff Virgilio Dela Cruz's Response thereto (Doc. No. 23), and Defendant's Reply (Doc. No. 26). After careful consideration, the Court grants in part and denies in part Defendant's Motion.

### I. Background

This is an employment discrimination action brought against St. John's School ("Defendant" or "St. John's") by a former employee of the school, Virgilio "Jay" Dela Cruz ("Plaintiff" or "Cruz"). Cruz was employed as a specialist in St. John's IT department beginning in 2014 until his termination in 2018. Plaintiff and Defendant each depict their own version of the events leading up to Cruz's termination. The Court briefly summarizes each party's depiction of the relevant facts below.

In Plaintiff's view, the evidence shows that Cruz was subjected to various forms of discrimination, harassment, and retaliation by St. John's throughout his employment. Defendant's allegedly unlawful or discriminatory acts took many forms, which included: targeted surveillance, ordered at the behest of the head of the school's security team; racial slurs and comments made by

various school employees and security personnel; and various violations of the school's internal policy regarding its handling of Cruz's complaints of harassment and other workplace misconduct. Plaintiff further claims that the school's supervisory personnel failed to investigate these matters or even worse, covered up the discriminatory behavior. Allegedly after Cruz complained about these instances of discrimination and harassment (and, in some measure, *because of* his complaints), Plaintiff's employment was terminated.

Defendant paints a different picture of the evidence. According to the school, an obvious decline in Cruz's performance and workplace demeanor took place beginning in spring 2018. During this time period, Cruz frequently showed up late to work, exhibited impatience with faculty and staff, refused to work in a collaborative manner, and took an inordinate amount of time to resolve support tickets assigned to him. The school held various discussions regarding Cruz's deteriorating performance. Despite these meetings, Cruz's performance did not get any better; instead, Cruz began displaying antisocial behavior toward his colleagues. Due to this shift in demeanor, the head of the school's security team advised that Cruz's arrival to work ought to be monitored in case he tried to bring a weapon onto campus. Ultimately, having given Cruz ample opportunity to correct his performance deficiencies, the school decided to terminate Cruz's employment.

Plaintiff sued in federal court (Doc. No. 1), bringing the following claims under Title VII of the Civil Rights Act of 1964: (1) discrimination based on race (*id.* at 14–15, "Count One"), (2) discrimination based on national origin (*id.* at 15–16, "Count Two"), (3) retaliation (*id.* at 16–17, "Count Three"), and (4) hostile and abusive working environment (*id.* at 17, "Count Four"). Defendant has moved for summary judgment on each of the foregoing claims pursuant to Rule

56(a). (Doc. No. 18.) Plaintiff filed a response thereto (Doc. No. 23), and Defendant replied (Doc. No. 26).

## II. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

## III. Discussion

The Court applies the foregoing standard to Plaintiff's claims of (a) discrimination based on race and national origin, (b) hostile work environment, and (c) retaliation, in that order. For the reasons expressed below, Plaintiff's discrimination and retaliation claims survive summary judgment, but his hostile work environment claim does not.

A.  **Discrimination Based on Race/National Origin**

Defendant's motion first argues that Cruz's race and national origin discrimination claims fail as a matter of law. (Doc. No. 18, at 12.) Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race*, color, religion, sex, or *national origin*." 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

A prima facie case of discrimination based on disparate treatment under Title VII requires a showing that the plaintiff: (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was the subject of an adverse employment action, and (4) was treated less favorably because of his or her membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Paske v. Fitzgerald*, 785 F.3d 977, 985 (5th Cir. 2015). Defendant has moved for summary judgment on Plaintiff's discrimination claims on the basis that Cruz has failed to make the requisite showing under the fourth, "similarly situated" element. (Doc. No. 18, at 19–20.)

On this element, Plaintiff points to the school's treatment of its former employee Brian Block ("Block"), a white man, who, like Cruz, worked in the IT department of St. John's and was terminated for poor work performance. (Doc. No. 23, at 15–16.) Block and Cruz were the only two individuals whose employment had been terminated (or recommended for termination) by Cruz's supervisor, Akram Annoushehi ("Annoushehi"), during her tenure as a director in the IT department. (Doc. No. 23, Ex. C, Annoushehi Depo., at 39:21–40:5.) In her deposition, Annoushehi testified that Block's termination was preceded by a written final warning or "write-up" (*id.* at 45:5–16) whereas Plaintiff's was not (*id.* at 57:23–58:6). Such "written counseling prior

4

to terminati[on]" (Doc. No. 23, at 16) was apparently required by the applicable disciplinary procedure, *see* (Doc. No. 23, Ex. B, at 5), the protection of which Block received, but Cruz did not. *See* (Doc. No. 23, Ex. M, Final Warning Letter to Brian Block).

In its motion, Defendant argues that Block cannot serve as the "comparator" upon which Plaintiff may base his discrimination claims, for two reasons. First, Block did not "have a history of 'violations' or 'infringements' similar to that of [Cruz]." (Doc. No. 18, at 19) (quoting *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009)). Second, Block was, in fact, terminated and therefore received treatment no more favorable than that which Plaintiff received. (*Id.* at 19–20.)

On this first point, the Court cannot hold as a matter of law that Block cannot serve as an adequate comparator. Like Cruz, Block worked in the IT department and had his employment involuntarily terminated for reasons of "poor performance and lack of professional behavior." (Doc. No. 18, at 20; *cf. id.* at 15 (describing as the reason for Cruz's termination "[his] continuous poor performance and failure to improve").) Moreover, both individuals reported to the same supervisors (Annoushehi and Jeff Ritter), in whom either individual's "ultimate employment status rested." *Lee*, 574 F.3d at 262. The only distinction Defendant offers with respect to Cruz is that "[n]o other Specialist displayed the same type of flagrant disrespect and poor performance that Dela Cruz did, including but not limited to constantly reporting to work late, failing to complete tasks, watching movies or sports while and work, *and* generally displaying a disrespectful attitude toward colleagues." (Doc. No. 18, at 19.) Even assuming Block's poor performance manifested itself dissimilarly,[1] the Court is "not persuaded"—at least as a matter of law—"that these

---

[1] This assumption is shaky. Jeff Ritter, head of the IT department, in deposition testimony described Cruz's and Block's "performance issues" in quite similar terms. When asked about Block's performance issues, Ritter testified:

> He would not take tickets. He would only take tickets from . . . for certain things and from certain people. He had problems dealing with stress and the pressure of helping teachers. And, he had issues dealing with conflict, both with teachers and within the team.

5

distinctions add up to a difference, at least not one sufficient to eschew comparison" to Cruz's situation. *Lee*, 574 F.3d at 262.

On the second point, the Court understands that both employees were ultimately terminated, but the evidence raises an issue as to whether Cruz received (or should have received) the benefit of a final written warning. *See* (Doc. No. 23, Ex. M). While a written warning ultimately might not have made a difference in the outcome, one purpose of providing such formal documentation is to put the employee on notice of issues with his or her performance and workplace behavior, such that the employee may correct their behavior accordingly and avoid summary termination. The Court accordingly declines to foreclose Plaintiff's discrimination claims on summary judgment on this basis.

Although Plaintiff has raised issues of material fact that support his prima facie case of discrimination, Defendant further argues that even if Cruz has summary judgment evidence sufficient to establish such a case, he cannot overcome St. John's legitimate, nondiscriminatory reason for his termination. (Doc. No. 18, at 18–19.) Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first make a prima facie pleading.[2] The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). If it does that, "the presumption of discrimination disappears." *Id.* The plaintiff, who always

---

(Doc. No. 18, Ex. D, at 5–6.) Similarly, when asked about Cruz's performance issues, Ritter testified:

> Not taking tickets. Taking tickets from only people he wanted to. Not completing tickets. Not staying on task. Issues within the team. The way he treated other people.

(*Id.* at 7.)

[2] The *McDonnell Douglas* burden-shifting framework "is applicable only in a directed verdict or summary judgment situation," and does not apply in a trial on the merits. *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 575 (5th Cir. 2004) (quoting *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986)).

6

has the ultimate burden, must then "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016).

Under this framework, Defendant argues that Cruz was terminated for the legitimate, nondiscriminatory reason of poor performance. In support, St. John's points to a text message by Cruz to a co-worker in which Cruz states that "I'm in that IDGAF stage right now." (Doc. No. 18, at 24 & n.17.) The text was sent in the weeks leading up to school's decision to terminate Cruz. (Doc. No. 18, Ex. J, at 2.) Further, Defendant points to the sworn testimony of Cruz's IT department supervisors that Cruz's performance issues were discussed with him "multiple times." (Doc. No. 18, at 12–13.) While certainly probative, these facts are not conclusive.

Plaintiff's response, by contrast, takes a different view of these discussions. For example, he points to his own testimony regarding his last performance review meeting that "there was no discussion whatsoever that was a negative view of [his] work performance." (Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, at 210:19–22.) Moreover, Plaintiff argues that his so-called "performance issues" were a mere pretext for the true reason for his termination: his complaints of harassment, which became the subject of a "cover up." (Doc. No. 23, at 5.) Plaintiff claims that the school terminated his employment because Plaintiff had threatened to take his complaints of harassment—which he asserts were repeatedly ignored by his supervisors—to the school's human resources department. In support, Plaintiff points to three separate occasions on which he reported harassment, as attested to in his deposition: (1) a complaint to Annoushehi in the wake of a school-facilitated Harassment Training class (Doc. No. 23, Ex. A, Cruz Depo., at 128:11–129:3, 184:9–16), (2) another complaint to Annoushehi after no action was taken on his first complaint (*id.* at

7

195:14–196:6), and (3) a complaint to Ritter in which Cruz threatened to make an "official complaint" with the school's human resources director (*id.* at 197:23–198:12).

Although Defendant disputes the contents of these discussions (as well as the measures that the school took in response to Cruz's reports), the Court cannot say as a matter of law that Cruz has brought forward no evidence controverting the legitimate, non-discriminatory reason proffered by Defendant. As a result, despite Defendant's assertion to the contrary, the Court finds that Plaintiff has evidence supporting the requisite showing of pretext under the *McDonnell Douglas* framework and that an issue of material fact exists which must be resolved by the jury. *See Outley*, 840 F.3d at 216.

**B.    Harassment/Hostile Working Environment**

Defendant also moves for summary judgment on Cruz's claim of hostile work environment. (Doc. No. 18, at 20–24.) A hostile work environment claim requires proof of "(1) membership in a protected group; (2) harassment (3) based on a factor rendered impermissible by Title VII; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment yet failed to address it promptly." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012). In its motion, Defendant contends that Cruz cannot establish the second, third, fourth, or fifth factors of his *prima facie* case. (Doc. No. 18. at 21.)

Plaintiff alleges "broad strokes" of racial harassment on the part of Defendant, all of which he claims ostensibly form the basis for evidence of a hostile working environment. (Doc. No. 23, at 6.) Due to this all-embracing nature of Cruz's claim, at the summary judgment stage the Court finds it suitable to subdivide the conduct at issue into three rough categories: (1) the monitoring of Cruz by school security personnel; (2) attendant racial comments by security officers over the

radio; and (3) references to race by one of Cruz's supervisors in the IT department. The Court analyzes each in turn.

*1. Campus Security's Monitoring of Cruz*

Cruz's "chief allegation of harassment" involves his being monitored by school security personnel. (Doc. No. 23, at 6.) This "monitoring" was ordered at the behest of St. John's Director of Safety Facilities and Physical Plant, Richard Still, who oversees security for the school. *See* (Doc. No. 18, Ex. M, Depo. of Richard Still, 23:25–24:14). In support of his claim, Plaintiff points to testimony elicited at Still's deposition. (Doc. No. 23, at 6–7 nn. 8–9.) Still testified that he instructed security personnel to pay attention to Cruz when he arrived on campus. (Doc. No. 23, Ex. E, Depo. of Richard Still, 38:2–8, 40:17–20.) In describing the motive behind his instructions, Still testified: "I basically wanted him to be observed when he arrived. . . . [M]ake sure he's not coming across the street with an assault rifle or similar type weapon. And that was the extent of it." (*Id.* at 37:10–12.)

Plaintiff took issue with the attention paid to him by security personnel. Cruz reported the monitoring in a report to Annoushehi in the following terms (as recalled by Cruz in his own deposition testimony):

> I feel like there is a effort to—an increased effort to surveil me for some reason. I don't know why. I don't know what's going on. . . . [T]he HPD [Houston Police Department] officers and some of the HFDs' [Houston Fire Department] attitudes and demeanors have completely changed from friendly to hostile. They won't even look my way. They won't even talk to me. There has been an increase in surveillance when I'm trying to do work after golf practice and until I leave the campus, . . . and then following me every step of the way around campus. . . . And being followed around campus, you really notice that they're driving their—their golf cart, following you towards the gym and towards—and they're parking it right in front of the middle school when they're not even assigned to that building and they're assigned to the upper school side. And then parking their car right next to my car in the tob-lot—you're moving—where you're—where you're going, what you're fixing and passing by, looking over your shoulder, you really start to notice

9

> stuff. And the—and not saying hi anymore, it—it takes a toll on, you know, what am I doing wrong? What have I done?

(Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, at 193:5–194:8.) Plaintiff further reported the officers' changed behavior to Ritter in terms of "them following every move that I make," which, "regardless of you're not doing anything or you're doing something, you still feel intimidation, especially if it's a whole HPD force and HFD force behind it." (*Id.* at 197:7–12.) Moreover, Plaintiff witnessed security officers' "postures change" and "be more alert" whenever Cruz would pass by them. Cruz perceived, for instance, that officers working the crosswalk always assumed a neutral posture of "resting their arms on their vests," except when Cruz would approach to cross, at which point the officers would place "their hand on the side in a posture on the side over their holster" until Cruz walked past and left. (*Id.* at 177:6–179:16.)

On this aspect of Cruz's hostile work environment claim, Plaintiff has simply failed to demonstrate the monitoring by security personnel rises to the level of conduct severe or pervasive enough to alter his conditions of employment and create an abusive working environment. As the Fifth Circuit has instructed, "[f]or harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993)). "Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive." *Id.* at 399 (citing *Harris*, 510 U.S. at 21–22). Moreover, none of the actions, in and of themselves, are based on any protected category.

In his response brief, Cruz makes no effort to refer the Court to any precedent finding harassment under similar factual circumstances. Instead, Plaintiff chooses to draw a distinction between "being watched" and "'being followed," the latter of which he contends occurred here.

Nonetheless, Cruz has cited no caselaw supporting a legal difference between the two modes of monitoring by security personnel.[3]

The Court does not equate security officers' increased attention to an admittedly unhappy employee with discriminatory harassment; especially given that Plaintiff has not shown that the security officers behaved differently with respect to individuals outside Plaintiff's protected class. As Plaintiff affirmed at his deposition, he "d[id]n't have any idea what their posture was when [he] wasn't around." (Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, 178:24–179:1.) As a result, while Cruz may have "perceive[d] the environment as hostile," he has not explained how the monitoring complained of rose to the level of objectively unreasonable hostility or abuse in violation of Title VII. *See WC & M Enters., Inc.*, 496 F.3d at 399. Furthermore, he has not presented sufficient evidence to permit a reasonable jury to find that the surveillance was based on his race.

*2. Security Officers' Racial Remarks over the Radio*

In further support of his claim of hostile work environment, Cruz points to "the use of a derogatory slur 'the Asian' to refer to Plaintiff over the school radio." (Doc. No. 23, at 6.) Plaintiff directs the Court to the following exchange at his deposition:

> **Q:** Sure. You said something changed with respect to the call signs and my question is—and you described the call signs that the officers used to refer to one another. I want to understand what was the connection between the use of Asian in respect to you as compared to the call signs that they were using for one another?
> **A:** Theirs is more of a—a—a—using their—their last name or a—a banter amongst themselves. Calling me the Asian, using—using the Asian as a way to identify me is—is demeaning. It's—it's racist. It's—you can call—you can call me by tech, you can say—refer to me as something else, but being—pointedly saying, "The Asian," and pointedly at you and locating you and using that call sign is—it's demeaning.

(Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, 192:4–19.)

---

[3] Indeed, Plaintiff cites no caselaw in his response brief, except with respect to Defendant's after-acquired evidence defense, which is addressed *infra*. *See* (Doc. No. 23, at 2, 20).

The "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment" such as to be actionable. *Harris*, 510 U.S. at 21 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Neither will "simple teasing [or] offhand comments" alone be actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Plaintiff self-identifies as "Asian by race." (Doc. No. 1, at ¶ 10.) In certain circumstances, a security personnel's reference of an individual by his or her self-designated racial identity may amount to discriminatory harassment in violation of Title VII, but there is no evidence that the administration of the Defendant was aware of or tolerated this behavior, because—as was recently pointed out at the pre-trial conference—these security officers are not employees of St. John's. Plaintiff cites no evidence to the Court that the employer knew about this conduct and failed to remedy it in support of this claim.

3. *Other Isolated Incidents*

Finally, Plaintiff points to other isolated incidents recalled by Cruz in his deposition:

- **Dec. 8, 2017:** Still refers to Cruz's vehicle as "little beaner car." (*Id.* at 165:10–15.)
- **Jan. 22, 2018:** Still comments to Cruz that he is a "lazy Mexican that can't do his damn job." (*Id.* at 160:24–161:5.)
- **Jan./Feb. 2018:** Ritter states to Cruz, "You should have known that. You're oriental," in reference to a computer screensaver featuring a skyline of the city of Hong Kong. (*Id.* at 123:11–124:12.)
- **March 8, 2018:** Still wrongly assumes Cruz is late to a meeting and makes a comment about Cruz "running on Mexican time." (*id.* at 184:17–185:2.)[4]

These remarks identified by Plaintiff certainly run outside the bound of general civility, but "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will

---

[4] Plaintiff also points to an undated incident in which HPD Officer Chris Heavens commented to another officer during crosswalk duty that Cruz is "a danger to society just based off of his skin tone and where he is." (*Id.* at 175:15–176:19.) Again, it is unclear that this security officer is an employee of St. John's or that the administration was aware of these alleged comments and failed to fix the situation.

not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). While this evidence may support his racial or national origin discrimination claims, Cruz has not shown that these isolated statements amount to conduct severe or humiliating enough under the standards governing hostile work environment. *See Harris*, 510 U.S. at 21. At most, he has shown that Ritter and the security officers were sometimes offensive and insensitive. *Cf. West v. City of Houston*, 960 F.3d 736, 742–43 (5th Cir. 2020) (affirming grant of summary judgment on hostile work environment claim involving allegations similar in number, frequency, and severity).

The Court, considering in sum the foregoing "broad strokes" of alleged harassment, finds that Cruz has failed to raise issues of material fact that would support a claim for hostile work environment under Title VII. The Court accordingly grants Defendant's motion as to this claim.

**C.    Retaliation/Wrongful Termination**

Defendant also moves for summary judgment on Cruz's final claim: retaliation. (Doc. No. 18, at 19–20.) Cruz claims that Defendant's termination of his employment constituted retaliation for engaging in "protected activities," namely, opposing the school's alleged discrimination and harassment. (Doc. No. 1, at 16.)

Under Title VII's "opposition clause," it is unlawful for an employer "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). A Title VII retaliation plaintiff must establish that: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 394 (5th Cir. 2000)).

A plaintiff asserting a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

On the one hand, St. John's contends that Cruz's termination came about due to his "continued poor performance." (Doc. No. 18, at 25.) On the other hand, Cruz argues that his termination came about due to his threats to escalate his reports of alleged harassment to the school's human resources department. (Doc. No. 23, at 7–23.)

For the purposes of evaluating Cruz's retaliation claim on summary judgment, the Court recognizes that Cruz's reports constituted protected activity under Title VII.[5] Defendant argues that Cruz's retaliation claim nonetheless fails for lack of causation. (Doc. No. 18, at 25–26.)

The Court concludes that the summary judgment evidence demonstrates more than a mere "temporal connection" between the filing of his reports and termination of his employment. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 487 (5th Cir. 2008). Cruz has pointed to his own deposition testimony regarding complaints he made to his supervisors about the harassment, and the lack of any corrective action on the part of the school. (Doc. No. 23, at 7–11.) In particular, Cruz made reports of alleged harassment to his supervisors in the IT department on three occasions—two reports to Annoushehi and one to Ritter. (Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, 192:20–193:18; *id.* at 195:14–196:6; *id.* at 196:7–22.) According to Cruz, the two times he spoke with Annoushehi she recommended against escalating the reports because "it wouldn't be good for [Cruz's] job and it would make the IT department look bad." (*Id.* at 213:23–25.) After

---

[5] Although the contents of these reports related in large part to the security team's monitoring of Cruz—conduct that did not rise to the level of harassment, *see supra*—the Court concludes that Plaintiff has met his burden of showing that he held a reasonable, good-faith belief that the conduct was unlawful under Title VII. *See EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 237 (5th Cir. 2016). Cruz's reporting to his supervisors therefore constituted protected activity. *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).

Annoushehi failed to escalate the issue—arguably violating the school's internal policy in the process[6]—Cruz met with Ritter, to whom he stated his intentions to take things up the ladder himself, threatening to file an "official complaint" with the director of the school's human resources department. (Doc. No. 23, Ex. A, Depo. of Virgilio Cruz, at 197:25–198:4.) Shortly thereafter, Cruz was fired (*id.* at 198:8–12), even though at his last performance review, "there was no discussion whatsoever that was a negative view of [his] work performance" (*id.* at 210:19–22). At his deposition, Ritter expressly acknowledged that his failure to report Cruz's complaint to human resources was a violation of St. John's policy. (Doc. No. 23, Ex. D, Depo. of Jeff Ritter, 187:8–12.)

The Court holds that the foregoing evidence, albeit circumstantial, is enough to create a genuine issue of material fact as to causation. Cruz's retaliation claim therefore survives summary judgment.

### D. Defendant's After-Acquired Evidence Defense

With respect to Defendant's after-acquired evidence defenses (Doc. No. 18, at 26–27), the Court finds there are genuine disputes of material fact that must be resolved by the jury.

### IV. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 18) is **GRANTED in part** as to Plaintiff's claim of hostile work environment and **DENIED in part** as to Plaintiff's claims of discrimination and retaliation. This case is set for trial in accordance with the schedule outlined by the Court.

---

[6] Annoushehi admitted at her deposition that Cruz had made an "official complaint" (Doc. No. 23, Ex. C, 116:5–16), which Plaintiff argues she was required to report to human resources pursuant to the Defendant's Anti-Harassment Policy (*id.*, Ex. B, St. John's School Handbook, at SJS 000117). *See* (Doc. No. 23, at 8–9).

Signed at Houston, Texas, this 10 day of November, 2021.

　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　Andrew S. Hanen
　　　　　　　　　　　　　　　　　　　　　United States District Judge

16